**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

OLIVIA PESCATORE, *et al.*,

Plaintiffs,

vs.

JUVENAL OVIDIO RICARDO PALMERA PINEDA, *et al.*,

Defendants.

vs.

CITIBANK, N.A.,

Turnover Respondent/Garnishee

*OFAC blocked assets of*:
Venezuela Ministry of Finance
a/k/a Ministerio del Poder Popular de Economía y Finanzas

No. 1:18-mc-00545-LGS

**MEMORANDUM OF LAW IN SUPPORT OF**
**PLAINTIFFS' MOTION FOR TRIA TURNOVER**

Plaintiffs submit this Memorandum in support of their Motion for entry of a TRIA Turnover Judgment directed to U.S. Dep't of Treasury's Office of Foreign Assets Control ("OFAC") blocked assets held and maintained in the United States by garnishee CITIBANK, N.A., and owned by the Venezuela Ministry of Finance a/k/a Ministerio del Poder Popular de Economía y Finanzas ("MINISTRY OF FINANCE"), which is an agency or instrumentality of a terrorist party, in partial satisfaction of Plaintiffs' Anti-Terrorism Act Judgment, pursuant to (i) Fed. R. Civ. P. 69(a); (ii) New York C.P.L.R. §§5230, 5232, 5225, 5227; (iii) §201(a) of the Terrorism Risk Insurance Act of 2002 ("TRIA"), codified at 28 U.S.C. §1610 note; (iv) Anti-Terrorism Act ("ATA"), 18 U.S.C. §2333(a); (v) *Stansell v. FARC*, 771 F.3d 713, 729-30 (11th

Cir. 2014) (agency or instrumentality standard affirmed by Eleventh Circuit's in *Stansell v. FARC*, 771 F. 3d 713, 732 (11th Cir. 2014); *Kirschenbaum v. 650 Fifth Ave & Related Properties*, 830 F.3d 107, 135 (2d Cir. 2016) ("To demonstrate that Defendants are 'agencies or instrumentalities' of a terrorist party under the TRIA . . . Plaintiffs must show that each Defendant (1) was a means through which a material function of the terrorist party is accomplished, (2) provided material services to, on behalf of, or in support of the terrorist party, or (3) was owned, controlled, or directed by the terrorist party."), citing *Stansell*, 771 F.3d at 724 n. 6 & 732.

As detailed below, this Court authorized Plaintiffs' execution of the MINISTRY OF FINANCE blocked assets held by CITIBANK, N.A. on February 8, 2021 (Order, Dkt. No. 91) and turnover should now be granted to ensure Plaintiffs can fully enforce their judgment against the FARC terrorist organization and its agencies or instrumentalities.

**I. <u>This Court has Subject Matter Jurisdiction and Jurisdiction over the Parties</u>**

This Court has subject matter jurisdiction over Plaintiffs' post-judgment execution proceedings under the TRIA and the ATA pursuant to 28 U.S.C. § 1331 and 18 U.S.C. § 2338 ("The district courts of the United States shall have exclusive jurisdiction over an action brought under this chapter [Terrorism]."). The TRIA and ATA authorize American nationals with judgments under the ATA, 18 U.S.C. § 2333(a), to execute their judgments against the blocked assets of a terrorist party, "including the blocked assets of any agency or instrumentality of that party." 18 U.S.C. § 2333. *See Kirschenbaum v. 650 Fifth Ave. & Related Props.*, 830 F.3d 107, 132 (2d Cir. 2016) ("Section 201(a) of the TRIA confers an independent basis for subject matter jurisdiction over post-judgment execution and attachment proceedings against property held in the hands of an agency or instrumentality of the terrorist party, even if the agency or

instrumentality is not itself named in the judgment."); *Stansell*, 771 F.3d at 737 (district court has subject matter jurisdiction over TRIA post-judgment executions).

This Court has jurisdiction over the blocked assets because the OFAC blocked assets are held at CITIBANK, N.A. in New York, and because Citibank, N.A. is subject to personal jurisdiction here. As such, this Court has the necessary authority to order turnover of the blocked assets in this district. *Koehler v. Bank of Bermuda Limited*, 577 F.3d 497 (2d Cir. 2009) (jurisdiction over garnishee is all that is required for turnover).[1]

## II. This Court is Authorized to Order Turnover Under TRIA

In New York, C.P.L.R. article 52 governs the enforcement and collection of money judgments. *See* N.Y. C.P.L.R. §§ 5201–5252. Section 5225(b) enables a judgment creditor to commence a proceeding against a third party who "is in possession or custody of money or other personal property" in which the judgment debtor has an interest. *Id*. § 5225(b). Section 5227 allows a judgment creditor to commence a proceeding against a third party "who it is shown is or will become indebted to the judgment debtor." *Id*. § 5227. Under Second Circuit law judgment creditor plaintiffs can seek a turnover order against garnishees by way of a motion under Rule 69(a) rather than instituting a "special proceeding" under New York state law, as long as the court has personal jurisdiction over the garnishee. *CSX Transportation, Inc. v. Island Rail Terminal, Inc.*, 879 F.3d 462, 468-469 (2d. Cir. 2018) (holding "a party seeking a money

[1] The judgment debtor terrorist party FARC is a properly served defaulted defendant. *See Pescatore*, 1:08-cv-02245, Order, Dkt. No. 16 at 8-9 (D.D.C. Nov. 4, 2010) (noting the FARC was properly served). The FARC defendants did not appear and defaults were properly entered against them all prior to entry of the Default Judgment. Accordingly, no further notice, service of pleadings, motions or writs is required to be served on the FARC or the individual FARC member identified in the ATA Judgment. Fed. R. Civ. P. 5(a)(2).

judgment against a non-party garnishee may proceed by motion and need not commence a special proceeding, as long as the court has personal jurisdiction over the garnishee.").[2]

## III. Plaintiffs Satisfy the Requirements of TRIA

Section 201(a) of the Terrorism Risk Insurance Act of 2002 ("TRIA") provides the federal statutory procedure for the enforcement of judgments by victims of terrorism and for executing on any blocked assets of the FARC, or any agency or instrumentality of the FARC. H.R. 3210, Terrorism Risk Insurance Act of 2002, Pub. L. No. 107-297, 116 Stat. 2322, codified at 28 U.S.C. §1610 note (emphasis added).

To satisfy the requirements of a TRIA execution, "plaintiffs must demonstrate first that (1) they have obtained a judgment, (2) against a terrorist party, (3) on a claim based upon an act of terrorism. . . . Then plaintiffs must establish that they are seeking to subject to execution in aid of that judgment (4) a blocked asset, (5) in which the terrorist party or an agency or instrumentality of the terrorist party holds a property interest. . . . (6) 'no adverse claimant ranks above [them] in priority of interest' to the asset at issue." *Levin v. Bank of New York Mellon*, No. 09-CV-5900 (JPO), 2019 WL 564341, *4 (S.D.N.Y. Feb. 12, 2019) (citations omitted). Plaintiffs satisfy each of these TRIA requirements.

### A. Plaintiffs have Obtained a Judgment Against a Terrorist Party on a Claim Based Upon an Act of Terrorism

Defendant FARC is the world's largest supplier of cocaine and was designated an FTO on October 8, 1997, and re-designated on September 5, 2001 by the Secretary of State of the United States pursuant to the Antiterrorism and Effective Death Penalty Act, 8 U.S.C. § 1189.

---

[2] The Court in *CSX Transportation* noted that this was already customary practice in federal court and explained that CPLR "special proceedings" are not recognized by the Federal Rules of Civil Procedure and that the form of such proceedings "need not be strictly adhered to as long as there is no prejudice to the opposing party in giving notice of the claims and framing the issues." *Id.* The Court further noted that the hallmarks of such "special proceedings," namely the *swift and economical resolution of the dispute*, are "more akin to motion practice than a plenary action." *Id*. (emphasis added).

The FARC has also been designated by the U.S. Treasury Department's Office of Foreign Assets Control ("OFAC") as a "specially designated global terrorist" under IEEPA E.O. 13224, and as a "specially designated narcotics trafficker" [SDNTK] under the Foreign Narcotics Kingpin Designation Act ("Kingpin Act")( 21 U.S.C. §§1901-1908) and OFAC's SDGT and Kingpin Act regulations (31 C.F.R. Parts 591, 598).

The Pescatore Plaintiffs (all U.S. citizens at the time of the terrorist acts) are the family members of Frank T. Pescatore, Jr., an American geologist who was kidnapped and murdered in Colombia by the FARC terrorist organization. *See Pescatore v. Palmera Pineda & FARC,* No. 08-2245, 345 F. Supp. 3d 68 (D.D.C. 2018). The U.S. District Court for the District of Columbia expressly found that the "Defendants [including the FARC] have properly been served, and that personal and subject matter jurisdiction exist for this action." *Pescatore*, 1:08-cv-02245, Order, Dkt. No. 16 at 1 (D.D.C. Nov. 4, 2010).[3]

In November 2018, the court awarded a judgment against the designated Foreign Terrorist Organization ("FTO") Revolutionary Armed Forces of Colombia ("FARC") for damages in the amount of $69,000,000.00. The Judgment was obtained pursuant to a civil action brought under the Anti-Terrorism Act ("ATA"), 18 U.S.C. § 2333, arising from the FARC's targeting of Americans. This judgment was registered in this district in November 2018 [Dkt. No. 1] pursuant to 28 U.S.C. § 1963 which provides that "[a] judgment so registered shall have the same effect as a judgment of the district court of the district where registered and may be enforced in like manner." There still remains due and owing $65,980,901.29 on the Judgment

[3] The district court noted FARC specifically targeted Frank Pescatore and sought ransom from his family because he was an American. Thus, "[d]ue to the purposeful targeting of Americans by terrorism, Defendants[FARC] have minimum contacts here to establish jurisdiction." *Pescatore*, 1:08-cv-02245, Order, Dkt. No. 16 at 10.

awarded.[4] Plaintiffs do not believe that the Defendants in said Judgment have in their possession visible property on which a levy can be made sufficiently to satisfy the said Judgment.

### B. The Assets of an Agency or Instrumentality under TRIA are Blocked and Subject to Execution

A TRIA execution requires two separate determinations: (i) the property must be blocked; and (ii) the owner of the property must be an agency or instrumentality under TWEA or IEEPA. *See Stansell*, 771 F.3d 7at 726.

#### 1. The MINISTRY OF FINANCE Assets are Blocked

Here, the U.S. Treasury Department's Office of Foreign Assets Control ("OFAC") under the Venezuela Sanctions Program 31 C.F.R. Part 591 and Executive Orders 13850 and 13857 established the first part of the analysis that the persons or entities are designated under IEEPA Executive Orders relating to Venezuela and that the property was and remains blocked. Supp. App. Dkt. Nos. 38-7; 38-8 (E.O. 13850); (E.O. 13857).

Under E.O. 13857 the term ''Government of Venezuela'' includes the state and Government of Venezuela, any political subdivision, agency, or instrumentality thereof, including the Central Bank of Venezuela and PdVSA, and any person owned or controlled, directly or indirectly, by the foregoing, and any person who has acted or purported to act directly or indirectly for or on behalf of, any of the foregoing, including as a member of the Maduro regime.

---

[4] This amount excludes any amounts under the victims' Confidential Joint Prosecution and Sharing Agreement with the *Stansell* plaintiffs (SDNY Case 1:16-mc-00405-LGS) who have also levied a writ of execution against the blocked assets at issue here. Both groups of victims have executed a Confidential Joint Prosecution and Sharing Agreement with respect to their post-judgment executions, *and they are not competing creditors or adverse claimants*. *See Stansell v. Revolutionary Armed Forces of Columbia*, No. 1:19-cv-20896-RNS, Dkt. No. 65 at 3 (S.D. Fla. Mar. 7, 2019) (stating plaintiffs have a joint prosecution and sharing agreement that "eliminates any issues of competing judgment lien priorities.").

As a result of these OFAC sanctions, MINISTRY OF FINANCE is also sanctioned and its securities and cash assets held by CITIBANK, N.A. are also blocked under IEEPA E.O. 13850 and 13857. Citibank's Blocking Report to OFAC states that "Citibank N.A. holds custody account **4024 **for account owner, [MINISTRY OF FINANCE]**."

OFAC's blocking established the first part of the analysis that the assets which Plaintiffs seek to attach are all blocked under the Venezuela Sanctions program and IEEPA Executive Orders 13850 and 13857. OFAC's designations are final agency action factual determinations entitled to great deference. *See Weinstein v. Islamic Republic of Iran*, 609 F.3d 43, 52 (2d Cir. 2010)(OFAC designation is a "factual finding"). A review of a decision made by OFAC is "extremely deferential" because OFAC operates "in an area at the intersection of national security, foreign policy, and administrative law." *See Islamic Am. Relief Agency v. Gonzales,* 477 F.3d 728, 734 (D.C. Cir. 2007); *De Cuelar v. Brady,* 881 F.2d 1561, 1565 (11th Cir. 1989) (OFAC decision entitled to great deference, and should be reversed only if arbitrary or capricious).

This Court, after a review of extensive evidence, determined that the assets owned by MINISTRY OF FINANCE were blocked for purposes of execution under the TRIA. Dkt. No. 58.

**2. MINISTRY OF FINANCE is an Agency or Instrumentality of the FARC**

TRIA §201 provides for execution on the blocked assets of "*any*" agency or instrumentality of a terrorist party. The agency or instrumentality standard in a TRIA execution requires that any individual members, divisions and networks of any blocked person, entity, organization or group that has "*ever*" been involved in the cultivation, manufacture, trafficking or distribution of FARC cocaine, or that has "*ever*" supplied financial or money laundering

services to the FARC, or its trafficking partners, "*directly or indirectly*" **…** "is an agency or instrumentality of the FARC under the TRIA." *Stansell*, No. 8:09–cv–2308, 2011 WL 13135641, at *2-3; (M.D. Fla. Sept. 6, 2011) (MDFL DE 322, ¶¶ 11-13). *See Stansell*, 771 F.3d at 742 ("evidence Plaintiffs presented to the district court was sufficient to establish the required relationship between FARC and the Partnerships, *even if that relationship was indirect*")(emphasis added). *See also Kirschenbaum*, 830 F.3d at 133 ("Precisely because TRIA § 201 encompasses non-state actors and, thus, reaches more broadly than the FSIA, it would contravene a plain reading of the TRIA to cabin its reach by applying the FSIA's definition of agency or instrumentality — which requires a foreign state principal."). Plaintiffs submitted substantial and competent evidence[5] establishing the second 'agency or instrumentality' part of the analysis sufficient for TRIA execution. *See Stansell*, 771 F.3d at 729.

*The Cartel of the Suns Support the FARC*

The Venezuelan "Cartel of the Suns" (Cartel de Los Soles) is headed by active duty and retired military officers and their civilian partners engaged in the trafficking of cocaine and laundering of drug proceeds on behalf of the FARC and other drug trafficking organizations. The Cartel of the Suns involves all elements of the Venezuelan infrastructure and state-owned entities and furthers a wide variety of illegal activities, including drug trafficking. The FARC operates in and out of Venezuela with the complicity of the Venezuelan government. The Cartel of the Suns is the primary vehicle for FARC international drug trafficking and money laundering.

[5] Appendix, *Stansell*, 1:16-mc-00405, Dkt. No. 16, Supplemental Appendix Dkt. No. 38, and affidavits from three expert witnesses.

The United States' March 2020 superseding indictment of Venezuela's President Maduro and the Cartel de Los Soles confirms the Cartel de Los Soles support to the FARC. In Count One (Narco-Terrorism Conspiracy) the indictment charges:

> 1. From at least in or about 1999, up to and including in or about 2020, NICOLAS MADURO MOROS, DIOSDADO CABELLO RONDON, HUGO ARMANDO CARVAJAL BARRIOS, a/k/a "El Pollo," CLIVER ANTONIO ALCALA CORDONES, LUCIANO MARIN ARANGO, a/k/a "Ivan Marquez," and SEUXIS PAUCIS HERNANDEZ SOLARTE, a/k/a "Jesfis Santrich," the defendants, participated in a corrupt and violent narco-terrorism conspiracy between the Venezuelan *Cartel de Los Soles* and the *Fuerzas Armadas Revolucionarias de Colombia* ("FARC").
>
> 2. From at least in or about 1999, up to and including in or about 2020, the FARC was a terrorist organization led at times by LUCIANO MARIN ARANGO, a/k/a "Ivan Marquez," and SEUXIS PAUCIS HERNANDEZ SOLARTE, a/k/a "Jesus Santrich," the defendants, among others -- that became one of the largest producers of cocaine in the world and perpetrated acts of violence against United States nationals and property.
>
> 3. From at least in or about 1999, up to and including in or about 2020, the *Cartel de Los Soles,* or "Cartel of the Suns," was a Venezuelan drug-trafficking organization comprised of high ranking Venezuelan officials who abused the Venezuelan people and corrupted the legitimate institutions of Venezuela – including parts of the military, intelligence apparatus, legislature, and the judiciary -- to facilitate the importation of tons of cocaine into the United States. The name of the *Cartel de Los Soles* is a reference to the sun insignias affixed to the uniforms of high ranking Venezuelan military officials who are members of the Cartel.
>
> 4. NICOLAS MADURO MOROS, the defendant, helped manage and, ultimately, lead the *Cartel de Los Soles* as he gained power in Venezuela. Under the leadership of MADURO MOROS and others, the *Cartel de Los Soles* sought not only to enrich its members and enhance their power, but also to "flood" the United States with cocaine and inflict the drug's harmful and addictive effects on users in this country. Thus, whereas most drug-trafficking organizations in South and Central America have sought to recede from their roles in importing narcotics into the United States in an effort to avoid U.S. prosecution, the *Cartel de Los Soles,* under the leadership of MADURO MOROS and others, prioritized using cocaine as a weapon against America and importing as much cocaine as possible into the United States.

*USA v. Nicolas Maduros Moros, et al*. SDNY Case No. S2 11-cr-205 Superseding Indictment. Supp. App. Dkt. No. 38-5. The indictment describes the FARC and its violence specifically directed at Americans like Plaintiffs herein:

> 11. Between at least in or about 1999, up to and including in or about 2020, the FARC became one of the largest producers of cocaine in the world. The FARC has also directed violent acts against United States persons and property in foreign jurisdictions, including, but not limited to, Colombia. For example, the FARC leadership ordered FARC members to kidnap and murder United States citizens and to attack United States interests in order to dissuade the United States from continuing its efforts to fumigate FARC coca fields and disrupt the FARC's manufacturing and distribution of cocaine and cocaine paste.

*Id*. The Cartel de Los Soles directly protected and facilitated the transshipment of FARC cocaine to the United States:

> 14. In furtherance of the narco-terrorism conspiracy, at various times between in or about 1999 and in or about 2020, members of the conspiracy organized their drug-trafficking activities as follows:
>
> > d. In order to achieve safe passage for the large cocaine shipments transiting Venezuela, members and associates of the FARC and the *Cartel de Los Soles* paid bribes, which ultimately benefited . . . the defendants, among others, in exchange for, for example, access to commercial ports and data from air and maritime radar in Venezuela. According to the United States Department of State, approximately 75 unauthorized flights suspected of drug-trafficking activities entered Honduran airspace in 2010 alone, using what is known as the "air bridge" cocaine route between Venezuela and Honduras.
> >
> > e. MADURO MOROS, CABELLO RONDON, CARVAJAL BARRIOS, and ALCALA CORDONES coordinated with the FARC in furtherance of the narco-terrorism conspiracy in order to: transport and distribute these large cocaine shipments; benefit from, and cause others to participate in, the provision of heavily armed security to protect the cocaine shipments; cause large quantities of previously-seized cocaine to be sold to drug traffickers in exchange for millions of dollars; interfere with drug-trafficking investigations and pending criminal cases in Venezuela and elsewhere; and help provide the FARC with military grade weapons, including machineguns, ammunition, rocket launchers, and explosives equipment.

Supp. App. Dkt. No. 38-5, Superseding Indictment ¶14.

The indictment makes clear that the Cartel de Los Soles' relationship with the FARC went beyond cocaine and *involved all aspects of the Venezuela Government and its infrastructure to further illegal activity with the FARC*.

> c. In or about 2006, Chavez made MADURO MOROS the foreign minister of Venezuela. During the same year, the FARC paid MADURO MOROS $5 million in drug proceeds, through a third party, in connection with a money-laundering scheme that was part of the narco-terrorism conspiracy. MADURO MOROS and others agreed to launder many millions of dollars from the FARC, including the $5 million, by purchasing palm oil extraction equipment from Malaysia with drug proceeds, which would be used to support the operation of African palm plantations in Apure that would appear legitimate. In connection with this scheme, in or about December 2006, Venezuela announced trade agreements with Malaysian firms relating to African palm oil extraction and crude oil exploration in Venezuela.
>
> d. In or about 2006, the *Cartel de Los Soles* dispatched a 5.6-ton cocaine shipment from Venezuela on a DC-9 jet bearing a United States registration number. DIOSDADO CABELLO RONDON and HUGO ARMANDO CARVAJAL BARRIOS, a/k/a "El Pollo," the defendants, worked with other members of the *Cartel de Los Soles* to coordinate the shipment. The jet departed Venezuela from Simon Bolivar International Airport in Maiquetia, Venezuela (the "Maiquetia Airport"), and landed at Ciudad del Carmen Airport in Campeche, Mexico. Mexican authorities seized the 5. 6 tons of cocaine when it arrived in Campeche.
>
> e. In or about 2008, Chavez, who was at that time the president of Venezuela and one of the leaders of the *Cartel de Los Soles,* agreed with LUCIANO MARIN ARANGO, a/k/a "Ivan Marquez," ***the defendant, to use funds from the Venezuelan state-owned oil producer, Petr6leos de Venezuela (PDVSA), to support the FARC's drug-trafficking and terrorist operations***.

Supp. App. Dkt. No.38-5, Superseding Indictment ¶15 (emphasis added).

*Testimony of Doug Farah*

Plaintiffs filed the testimony of Doug Farah [Dkt No. 37-3], a recognized expert for the Department of Defense and other U.S. Government agencies on illicit drug trafficking; the relationship among different global terrorist organizations to state and non-state actors in Latin

America; the global criminal-terrorist nexus, including the nexus between the Middle East and Latin America; and the FARC. Mr. Farah testified that:

> 52. The Venezuelan "Cartel de Los Soles" (Cartel of the Suns) is headed by active duty and retired military officers and their civilian partners engaged in the trafficking of cocaine and laundering of drug proceeds on behalf of the FARC and other drug trafficking organizations. The Cartel of the Suns and its members are in part responsible for the failed state of Venezuela and use such a weakened state condition to assist the FARC and other drug trafficking organizations. The structure is among the primary enablers of the massive corruption and drug trafficking networks that are corroding the rule of law across Latin America.
>
> 53. []The Cartel of the Suns is the primary drug trafficking, drug moving and money laundering organization in Venezuela through various state-owned enterprises, and the FARC is the primary supplier of drugs and illicit gold that the Cartel of the Suns survives on.
>
> * * *
>
> 58. The Cartel of the Suns and its leaders use government ministries, state owned enterprises and their corporate subsidiaries to move, conceal and launder their criminal proceeds to sustain the Cartel's operations.

Dkt. No. 37-3 Affid. Doug Farah ¶¶ 52, 53, 58.

The MINISTRY OF FINANCE and its subsidiaries, including BANDES, are each a member of the corrupt Maduro regime and the United States' definition of the "Government of Venezuela". Plaintiffs' filed expert witness testimony establishing that that the MINISTRY OF FINANCE is a member of the Cartel of the Suns' financial network and an agency or instrumentality of the FARC.

> 58. The Cartel of the Suns and its leaders use government ministries, <u>state owned enterprises and their corporate subsidiaries to move, conceal and launder their criminal proceeds to sustain the Cartel's operations</u>. PDVSA and its subsidiaries are the primary vehicle used to launder FARC and Cartel profits from narcotics trafficking and other criminal activities used to sustain the conspiracy.
>
> * * *
>
> And several Venezuelan banks have been sanctioned by OFAC, in part for attempting to help Maduro move $1 billion from Venezuela to Uruguay. The U.S. Treasury Department's OFAC made a factual finding that <u>"[r]egime insiders have transformed BANDES and its subsidiaries into vehicles to move funds abroad in an attempt to prop up Maduro</u>." These are just some of many examples of state owned entities involvement in corruption, bribery, fraud and

> money laundering, all of which sustains the Cartel of the Suns and its leaders, and therefore the FARC.
>
> * * *
>
> 63. It is my opinion that the Maduro regime survives as a narco-state because of its decades of ongoing material support to the FARC, and that the members of the Venezuelan Cartel of the Suns are each an agency or instrumentality of the FARC because the Cartel and its leaders have been providing the FARC with substantial logistics, security, operational and financial protection for the past two decades. This includes the many oil, finance, aviation, mining and other government agencies, state owned enterprises, and their corporate subsidiaries, that the Cartel leaders have used to sustain, conceal, move and launder the Cartel's vast profits from its narcotics trafficking and other criminal activities, all of which directly enable the Cartel to maintain itself as the backbone of the criminalized Maduro regime despite significant international sanctions on the regime, the FARC, the allied Ortega regime in Nicaragua, including, but not limited to:
>
> VZ government ministries:
>
> - Venezuela Ministry of Finance

Farah Affid. Dkt. No. 37-3, pp. 32-33, 37 (emphasis added); Appendix Dkt. No. 38-17 OFAC Press Release March 22, 2019: *Treasury Sanctions BANDES, Venezuela's National Development Bank, and Subsidiaries*. *See* Order Dkt No. 58. Mr. Farah testified that the Venezuela MINISTRY OF FINANCE is an agency or instrumentality of the FARC. *Id*. at pp. 37-38.

*Testimony of Former DEA Deputy Chief of Operations*

Plaintiffs filed the affidavit of David Gaddis a former senior official with the Drug Enforcement Administration and former Deputy Chief of Operations, Office of Global Operations, Chief of Enforcement Division. Dkt. No. 37-4. Mr. Gaddis testifies that:

> 21. There has been long-standing cooperation between the FARC and ELN and the Venezuelan government, the Venezuelan military, Venezuelan state-owned companies generally, and PDVSA specifically, in a joint criminal enterprise to send cocaine to the United States and launder the proceeds.
>
> 22. The current Venezuela Government, similar to the Chavez Government before his death, is relying on FARC drug trafficking enterprises that are comingled with government connected corporations in order to boost finances of civilian government and military leaders. According to recent summations of the relationship:

> "This alliance of Bolivarian states together with the FARC have coalesced into what we define as the Bolivarian Joint Criminal Enterprise – or a consortium of criminalized states and non-state actors working in concert with shared objectives. This joint criminal enterprise has not only taken billions of dollars from Venezuelan state coffers, but also used PDVSA as the central structure for money laundering and corruption throughout the region. The criminal portfolio used by those in this movement has continued to diversify as oil prices dropped and PDVSA's production stalled. Such conditions forced incoming president Nicolas Maduro to rely even more on activities like cocaine trafficking and illicit gold production, but even with PDVSA's decline the regime continues to function as a criminal operation.

Dkt. No. 37-4**,** Affid. of David Gaddis ¶¶ 21, 22. Mr. Gaddis testifies that the BANDES subsidiaries are each an agency or instrumentality of the FARC:

> It is my opinion based upon my educations, training and over 25 years of experience in the DEA that the Cartel of the Suns and all of its members, front-persons, supporters, front companies, and financial networks are agencies or instrumentalities of the FARC because: (i) of its significant material assistance in direct support of the international narcotics trafficking activities of the FARC; (ii) its active involvement in cultivation, manufacture, processing, purchase, sale, trafficking, security, storage, shipment or transportation, and distribution of FARC cocaine and/or paste; and (iii) its facilitation and direct assistance through its state-owned enterprises—functioning in essence—as the FARC's major money laundering network and financial network playing a significant role in international narcotics trafficking of the FARC. As key members of the Cartel of the Suns, each of the ministries, state owned entities, including subsidiaries of state-owned entities are each an agency or instrumentality of the FARC:
> [listing BANDES and its subsidiaries and MINISTRY OF FINANCE].[6]

Dkt. No. 37-4, ¶35.

Plaintiffs have demonstrated with competent and substantial evidence that the Cartel of the Suns members, including the BANDES subsidiaries and MINISTRY OF FINANCE, are each an agency or instrumentality of the terrorist party FARC under the TRIA agency or instrumentality standard. *See Stansell v. FARC*, 771 F.3d 713, 732 (11th Cir. 2014); *Kirschenbaum v. 650 Fifth Ave & Related Properties*, 830 F.3d 107, 135 (2d Cir. 2016). Both

[6] Plaintiffs also file the affidavit of Brian Fonseca. Dkt. No. 37-5**.**

the Second Circuit and Eleventh Circuit noted that TRIA's standard relied on "the plain and ordinary meaning" of the terms "agency" and "instrumentality." *Kirschenbaum*, 830 F.3d at 135; *Stansell*, 771 F.3d at 732, (purpose of the TRIA to "deal comprehensively with the problem of enforcement of judgments rendered on behalf of victims of terrorism"), quoting *Hausler v. JPMorgan Chase Bank, N.A.*, 740 F. Supp. 2d 525, 531 (S.D.N.Y. 2010). Evidence is sufficient to establish a relationship between the terrorist party and the purported agency or instrumentality, although that relationship may be "indirect." *Kirschenbaum*, 830 F.3d at 133; *Stansell*, 771 F.3d at 742. There is no temporal limitation and past conduct and dealings satisfy the standard. *Kirschenbaum*, 830 F.3d at 133, 135; *Stansell*, 771 F. 3d 724, 731-32. Plaintiffs have demonstrated that the OFAC sanctioned entity owners of the blocked assets here are agencies or instrumentalities for purposes of execution. *See* Dkt. No. 37-1-5.

Based upon all of this evidence, including substantial appendices, this Court determined that the MINISTRY OF FINANCE is an agency or instrumentality of the FARC for purposes of TRIA attachment and execution. Dkt. No. 91. This Court completed the two separate determinations in this post-judgment TRIA execution (i) whether the property is blocked—here under IEEPA, and (ii) that the sanctioned persons or entities owning or having an interest in the blocked property are agencies or instrumentalities of the terrorist party FARC. *See Stansell*, 771 F.3d at 726. The MINISTRY OF FINANCE OFAC blocked assets being held by CITIBANK, N.A. are subject to execution and turnover under TRIA without delay. *See Stansell*, 771 F.3d at 726.

Plaintiffs have satisfied the requirements of TRIA because they obtained an ATA judgment against the FARC, a "terrorist party" as defined by the TRIA Section 201(d)(4), on a claim based on an "act of terrorism" as defined by TRIA Section 201(d)(1)(B). They now seek

to enforce that ATA judgment against blocked assets of "any agency or instrumentality of that terrorist party." 18 U.S.C. § 2333. The blocked assets at issue are not immune from attachment under the TRIA as sovereign, diplomatic or consular property. The TRIA allows terrorism victim judgment holders to execute on blocked assets of designated persons, entities or organizations not named in the ATA Judgment. *Weinstein v. Islamic Republic of Iran*, 609 F.3d 43, 50 (2d Cir. 2010).

The OFAC does not require a license for plaintiffs to execute on blocked assets under the TRIA. *Weininger v. Castro*, 462 F. Supp. 2d. 457, 499 (S.D.N.Y. 2006). Plaintiffs have complied with all litigation reporting requirements to OFAC under 31 C.F.R. 501.605.

## IV. Plaintiffs have Complied with New York law under Fed. R. Civ. P. 69

By Order entered February 8, 2021 [Dkt. No. 91], the Orders and Judgments Clerk issued a writ of execution on February 9, 2021 which was delivered to the court appointed process server that same date and levied upon, and accepted by, the garnishee CITIBANK, N.A. in New York on February 12, 2021 pursuant to CPLR §5232. The writ, including the attached Exemption Notice; Notice to Judgment Debtor or Obligor; and two Exemption Claim forms, was levied by a specially appointed process server pursuant to FRCP 4.1. *See* Order Dkt. No. 40, p. 2. The levy perfected Plaintiffs' judgment lien on the subject blocked accounts. Statutory notice of levy was timely provided to MINISTRY OF FINANCE in compliance with CPLR §5232(c). No other creditors have priority over these Plaintiffs.[7]

Any state law that purports to bar Plaintiffs' right to execute on these blocked assets is preempted by TRIA. Section 201(a) of the TRIA states that "[n]otwithstanding any other

[7] The *Pescatore* and *Stansell* Plaintiffs (Case No. 1:16-mc-00405-LGS) are not competing creditors or adverse claimants, and the writs of execution from each case were levied simultaneously upon Citibank, N.A.

provision of law" the blocked assets of a terrorist party "shall be subject to execution or attachment in aid of execution." 28 U.S.C. §1610 note. As the Supreme Court has observed, "'[a] clearer [preemption] statement is difficult to imagine.'" *Cisneros v. Alpine Ridge Group*, 508 U.S. 10, 18 (1993) (citation omitted). *See also Conyers v. Rossides*, 558 F.3d 137, 145 (2d Cir. 2009). Thus, as TRIA's legislative history states: "The purpose of Section 201 is to deal comprehensively with the problem of enforcement of judgments rendered on behalf of victims of terrorism in any court of competent jurisdiction by enabling them to satisfy such judgments through the attachment of blocked assets of terrorist parties. It is the intent of the Conferees that Section 201 establish that such judgments are to be enforced." H.R. Rep. No. 107-779, at 27 (2002).[8]

## V. <u>Plaintiffs' ATA Damages are Fully Recoverable Under TRIA</u>

Plaintiffs' ATA damages were awarded on the face of their judgment as compensatory damages and are fully recoverable under 18 U.S.C. § 2333. These damages do not include any prejudgment interest or punitive damages, and both case law and the ATA's legislative history indicate that ATA treble damages are compensatory and enforceable under TRIA. Three different federal district court judges have expressly declared the ATA treble damages to be compensatory damages. *See Stansell v. Revolutionary Armed Forces of Columbia*, No. 19-20896-CIV, 2020 WL 4692748, *1 (S.D. Fla. July 16, 2020) (holding ATA treble damages are compensatory and comparable to RICO and Clayton Act damages where "[t]he damages provisions of both statutes are remedial.") (citing *Agency Holding Corp. v. Malley-Duff & Associates, Inc*., 483 U.S. 143, 151 (1987)); *Estate of Parsons v. Palestinian Auth.,* 651 F.3d 118, 148 (D.C. Cir. 2011) (Brown, J., concurring) ("Treble damages [under the ATA] are

[8] https://www.congress.gov/107/crpt/hrpt779/CRPT-107hrpt779.pdf.

statutory or liquidated damages—not punitive damages."); *Antiterrorism Act of 1990: Hearing on S. 2465 Before the Subcomm. on Courts and Administrative Practice of the S. Judiciary Comm*., 101st Cong. 34 (1990) (statement of Steven R. Valentine, U.S. Dept. of Justice Deputy Assistant Att'y Gen., Civil Division) ("[The ATA] provides a federal forum for any national of the United States to seek *compensation in the form of treble damages* for injuries resulting from acts of international terrorism") (emphasis added).[9] *See also Stansell v. FARC*, MDFL Case No.-09-cv-2308 Dkt. No. 1222, Oct. 5, 2020 Order Denying OFAC blocked parties Rule 60(a) motion at 6 ("Therefore, because judgment was entered for each plaintiff "for compensatory damages" in a specified amount, Movants' blocked assets are subject to execution or attachment in aid of execution in order to satisfy those amounts.); *see also id*. at 13 ("Movants seek to amend the Judgment so that they may limit Plaintiffs' enforcement thereof, which would deprive Plaintiffs of hundreds of millions of dollars. This proposed amendment extends beyond correcting a misnomer or a mathematical computational error.").[10]

WHEREFORE for the reasons set forth above, Plaintiffs respectfully request that this Court enter an Order (in the form proposed as Exhibit 1) ordering the garnishee CITIBANK, N.A. to liquidate and transfer and turnover pursuant to TRIA any and all securities, cash or

[9] https://books.google.com/books?id=TcITAAAAIAAJ&pg=PP3#v=onepage&q&f=false.

[10] Middle District of Florida Senior Judge Richard Lazzara, no fewer than *ten times* during the *Stansell* Plaintiffs' execution efforts, issued post-judgment issuance-of-writ orders that specifically reiterated his intent that the 2010 ATA Judgment was solely for compensatory damages. Judge Lazzara's orders, spanning roughly five years' of execution efforts, each time reiterated and recounted unambiguously that "Plaintiffs' Judgment is solely for compensatory damages" (Dkt. Nos. 252 at 3; 261 at 3; 300 at 12; 322 at 11), or otherwise included the functionally-identical phrase that "Plaintiffs have a federal district court judgment for compensatory damages only[.]" Dkt. Nos. 323 at 10; 324 at 10; 325 at 10; 326 at 13; 327 at 13; 900 at 10. After denying the Rule 60(a) motion, Middle District of Florida Judge Charlene Honeywell also entered a turnover judgment finding that "Plaintiffs' judgment is for compensatory damages." Dkt. No. 1216 at 2.

property interests it holds of the Venezuela Ministry of Finance a/k/a Ministerio del Poder Popular de Economía y Finanzas to Plaintiffs until Plaintiffs' ATA judgment is fully satisfied.

Date: April 9, 2021

Respectfully submitted,

/s/ Nathaniel A. Tarnor
Hagens Berman Sobol Shapiro, LLP
322 8th Avenue, Suite 802
New York, NY 10001
Telephone: (646) 543-4992
Email: NathanT@hbsslaw.com

*Counsel for the Pescatore Plaintiffs/Judgment Creditors*

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on April 9, 2021, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system. I further certify that I served the foregoing document by electronic mail or certified or registered mail to the following persons:

VENEZUELA MINISTRY OF FINANCE
a/k/a Ministerio del Poder Popular de Economía y Finanzas
Av. Urdaneta, con Esq. de Carmelitas
Edif. Sede del MPPPF
Caracas, Distrito Capital
Venezuela

OFFICE OF FOREIGN ASSETS CONTROL
U.S. Department of the Treasury
1500 Pennsylvania Ave. NW Washington DC
*Via email to OFAC counsel in compliance with 31 CFR 501.605*

None of the FARC defendants have appeared and defaults were properly entered against them all prior to entry of the Default Judgment. Accordingly, no further notice, service of pleadings, motions or writs is required to be served on the FARC or the individual FARC members identified in the ATA Judgment. Fed. R. Civ. P. 5(a)(2).

/s/ Nathaniel A. Tarnor
Hagens Berman Sobol Shapiro, LLP
322 8th Avenue, Suite 802
New York, NY 10001
Telephone: (646) 543-4992
Email: NathanT@hbsslaw.com

*Counsel for the Pescatore Plaintiffs/Judgment Creditors*